1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
9                              AT TACOMA

10    VICTOR JULIAN TURNER,

11                         Plaintiff,                    CASE NO. 3:20-CV-5472-TL-DWC

12            v.                                         REPORT AND RECOMMENDATION

13    TORI RALKEY, et al.,                               Noting Date: May 13, 2022

14                         Defendants.

15

16          The District Court referred this action to United States Magistrate Judge David W.

17   Christel. Plaintiff Victor Julian Turner, aka Mikailah Kay Sweetgrass-Turner[1], proceeding *pro se*

18   and *in forma pauperis*, brings claims under 42 U.S.C. § 1983 alleging First, Eighth and

19   Fourteenth Amendment claims arising out of her[2] treatment as a transgender prisoner. Currently

20   _____

21          [1] Plaintiff's legal name is Mikailah Kay Sweetgrass-Turner (Dkt. 75-1 at 387), but all correspondence must
     be directed to plaintiff's "commitment name," Victor Julian Turner, which is reflected in the caption. Dkt. 10 at 1.

22
            [2] Plaintiff has expressed a preference for female pronouns. Dkt. 56 at 11. Defendants have, throughout their
23   briefing, also referred to plaintiff with a feminine pronoun. In light of the parties' usage and consistent with the
     practice of the Ninth Circuit in cases involving transgender parties, the Court refers to plaintiff with female
     pronouns. *See, e.g., Schwenk v. Hartford,* 204 F.3d 1187, 1192 n.1 (9th Cir. 2000). In doing so, the Court does not
24   make any determination as to the merits of any claim or defense in this matter.

before the Court are plaintiff's motion for summary judgment (Dkt. 75) and defendants' cross-motion for summary judgment (Dkt. 78). For the reasons discussed below, the Court recommends plaintiff's motion be DENIED and defendants' motion be GRANTED.

## BACKGROUND

### A.    Procedural History

Plaintiff is a transgender prisoner confined at Stafford Creek Corrections Center ("SCCC"). Plaintiff initiated this matter on May 19, 2020 ( Dkt. 1) and filed her second amended complaint—the operative complaint in this matter—on April 22, 2021. Dkt. 56.

Plaintiff identifies the following 14 SCCC and Department of Corrections ("DOC") staff as defendants: Tori Ralkey, SCCC Prison Rape Elimination Act ("PREA") Compliance Specialist, Chip Thornhill, SCCC Correctional Sergeant, Charlotte Headley, SCCC Security Operations Manager, Dennis Cherry, SCCC Custody Unit Supervisor, Barry DeHaven, SCCC PREA Specialist, Phil Hawks, SCCC Sergeant, Daniel Downing, SCCC Correctional Officer, Gregory Jones, SCCC Custody Unit Supervisor, Dennis Persell, SCCC Correctional Officer, Gina Penrose, SCCC Associate Superintendent, Steven Sinclair, DOC Secretary, Risa Klemme, DOC Americans with Disabilities Act Coordinator, Tim Thrasher, DOC director of mental Health Services / Mission Housing Administrator, and Ronald Haynes, SCCC Superintendent. Dkt. 46 at 3–5. Plaintiff also names two "John Doe" defendants. *Id*. at 5.

Plaintiff alleges defendants acted with deliberate indifference to her safety in violation of the Eighth Amendment by (1) assigning cellmates she considered unsafe, (2) denying her request to be housed with an inmate of her choice, (3) refusal by defendant Downing to refer to plaintiff by her preferred female pronouns, (4) prolonging plaintiff's housing in administrative

segregation during her pending disciplinary matter, and (5) failing to transfer plaintiff to a women's prison. Dkt. 56 at 21–34. Plaintiff alleges defendants violated her Fourteenth Amendment right to equal protection by defendant Downing's failure to use female pronouns and by refusing to house plaintiff with her cellmate of choice. *Id*. Plaintiff alleges defendants violated her due process rights by denying her rights under prison regulations, prolonging her placement in administrative segregation, denying her grievances and failing to transfer her to a women's prison. *Id*. Plaintiff also asserts her expression of her transgender identity was "chilled" in violation of the First Amendment. *Id*. Finally, plaintiff alleges defendants violated the Americans with Disability Act ("ADA") by failing to accommodate her gender dysphoria during her stay in administrative segregation and by failing to transfer her to a women's prison. Dkt. 56 at 20.

Plaintiff filed a motion for summary judgment, together with attached exhibits, on November 17, 2021. Dkt. 75. Pursuant to a combined briefing schedule entered by the Court, defendants filed their combined response and cross-motion for summary judgment, together with a *Rand* notice and eight declarations, on December 6, 2021. Dkts. 78, 79–87. Pursuant to the Court's Order granting plaintiff's request for an extension, plaintiff filed her consolidated response/reply and accompanying exhibits on January 3, 2022. Dkt. 92. Defendants filed their reply on February 17, 2022. Dkt. 93.

**B.   Facts[3]**

Plaintiff is a male-to-female transgender prisoner who first announced her transgender identity to prison staff on May 29, 2019. Dkt. 56 at 6. After announcing her transgender

_____

[3] The facts discussed herein are based upon plaintiff's second amended complaint (which is verified under penalty of perjury), the materials submitted by plaintiff with her motion for summary judgment and her

1   identification, plaintiff began taking hormone replacement therapy, legally changed her name

2   and requested (and was issued) female undergarments. *Id*. She is working toward obtaining

3   gender confirmation surgery. Dkt. 80 at 10.

4       1.   PREA Risk Assessment and Cell Move Policy

5           Shortly after plaintiff's announcement, she completed a Gender Dysphoria Protocol. Dkt.

6   56 at 7. Pursuant to DOC policy, prisoners who newly disclose transgender, intersex or gender-

7   nonconforming identity are scheduled for a PREA Risk Assessment; classification counselors

8   must develop a monitoring plan, which is subject to regular reviews by a Facilities Management

9   Review Team. Dkt. 75 at 168–70. Housing assignments for these prisoners must be reviewed to

10  ensure compatibility, and to ensure that prisoners scoring as high risk for victimization are not

11  housed with prisoners scoring as predation risks. *Id*. at 172. A review committee reassesses

12  housing every six months to review any threats to safety. *Id*. at 173–4. The policy expressly

13  provides that transgender prisoners may report issues with showering to the Superintendent. *Id*.

14          Housing assignments at DOC facilities are made in accordance with DOC Policy 420.140

15  and are based on a number of factors including consideration of 18 specific objective criteria set

16  forth in the policy. *See* Dkt. 79-1 at 2–5 (DOC Policy 420.140, Cell Room Assignments). Among

17  the objective criteria considered in making housing decisions are medical or mental health issues,

18  length of incarceration, physical size and age of the offenders, PREA risk assessment and

19  housing assignment requirements, self-disclosed concerns of offenders, commitment offense,

20  incarceration history, and predation/victimization issues. *Id*. The policy permits a unit sergeant to

21  request a move for unit needs and it also permits an inmate to request a change in cell

22

23  _____

24  response/reply, and the Declarations and exhibits submitted by defendants in support of their cross-motion for
    summary judgment. Dkts. 56, 75, 92, 79–86.

1    assignments. *Id.* In order to request a change in cell assignment, an inmate must complete a DOC

2    specified form and all inmates who will be residing in the cell must sign the form indicating they

3    agree to the move. *Id.*

4         The process of moving inmates is complex. In addition to balancing the numerous criteria

5    listed in Policy 420.14 for the inmates who are moved, the process also requires considering all

6    of these factors for any "chain reaction" effects among other inmates in the population. Dkt. 83

7    at ¶ 3.

8         2.   Plaintiff's 2019 Housing Re-Assignments

9         On May 28, 2019—just before plaintiff had announced her transgender identity—she was

10   selected for a cell move that was made for institutional needs. Dkt. 56 at 5; Dkt. 84-1 at 3.

11   Plaintiff objected to the move and filed a grievance. Dkt. 84-1 at 2. The grievance was

12   investigated, appealed, and processed through three levels. Dkt. 84-1 at 2–15. Plaintiff

13   complained that her new cellmate was Muslim and had "known issues with homosexual/trans

14   people," and that she and the assigned cellmate had "STG [Security Threat Group] issues as

15   well." Dkt. 84-1 at 2. The first level investigator reported, after interviewing plaintiff, that her

16   "big issue is that [s]he was comfortable where [s]he was . . . and did not want to move." Dkt. 84-

17   1 at 3. Interviews of the staff who had ordered the cell change indicate that plaintiff had not yet

18   revealed her transgender identity as of the time of the move. Dkt. 84-1 at 6. The Level II

19   response noted this, reporting that once the issues became known, plaintiff was moved to another

20   cell. Dkt. 84-1 at 8. The response to plaintiff's Level III appeal concluded the move had been

21   within policy guidelines. Dkt. 84-1 at 15.

22        Plaintiff completed her first PREA Risk Assessment pursuant to the PREA policy on

23   May 30, 2019. Dkt. 80 at ¶ 1; Dkt. 80-1 at 2–3. She reported she "feels safe" at SCCC. Dkt. 80-1

24   at 3.

1    On July 15, 2019, defendant Thornhill approved a request to place plaintiff in a cell with

2    an incoming prisoner. Dkt. 86 at 1–2. The move was also approved by defendants Thrasher and

3    Ralkey. Dkt. 86-1 at 2. An electronic recordkeeping entry ("chrono") for this move shows that it

4    had received a PREA housing risk assessment review; the two prisoners' risk assessment scores

5    were found compatible; and defendant Ralkey had approved the move. *Id.* at 4.

6    Plaintiff filed a grievance about this move. Dkt. 84-1 at 17. Although plaintiff's

7    complaint alleges the assigned cellmate was a sex offender (Dkt. 56 at 7), plaintiff's grievance

8    does not address this; instead, plaintiff complains the move had not received the proper PREA

9    reviews. Dkt. 84-1 at 17. Plaintiff withdrew the grievance after being informed that PREA

10   housing procedures had been correctly followed. *Id.*

11   Plaintiff was assigned another new cellmate on July 30, 2019; plaintiff alleges this

12   cellmate was a "sex offender" but provides no additional information about the offender's

13   conviction or risk factors. Dkt. 56 at 8. The chrono entry for this assignment indicates risk

14   assessment scores were reviewed and were compatible; the move was approved by defendant

15   Ralkey. Dkt. 86-1 at 4. The evidence does not include any grievances regarding this cellmate

16   assignment.

17   Plaintiff was assigned another cell move on August 27, 2019. The chrono entry for this

18   move indicates risk assessment scores were compatible and the move was approved by defendant

19   Ralkey. Dkt. 86-1 at 4. Plaintiff alleges this cellmate, too, was a "convicted sex offender." Dkt.

20   56 at 8. The record contains no grievances regarding this cellmate assignment, but plaintiff

21   submitted a declaration from the cellmate, Wayne Gilpin, which states that plaintiff was very

22   upset about the assignment. Dkt. 75-1 at 350.

23

24

On October 25, 2019, plaintiff submitted a cell change request to share a cell with inmate John Horn. Dkt. 75-1 at 406. Plaintiff's mental health provider, Melvin Coplin, sent an email expressing his support of the request. Dkt. 82-1 at 11. The request was denied "per Ralkey PREA coordinator." *Id*. Defendant Ralkey states in discovery responses that she denied the request due to "confidential information." Dkt. 81-1 at 5. Plaintiff filed a grievance about the denial, which she appealed to Level III; at each level, the investigators confirmed that the denial had been made by defendant Ralkey for confidential PREA safety and security reasons. Dkt. 84-1 at 32, 38, 43.

### 3. Plaintiff's PREA Complaint Against Defendant Downing

During an interaction with defendant Downing in the dining area on April 11, 2020, plaintiff requested he stop calling her "sir" and use female pronouns and terminology. Dkt. 56 at 10–11. Defendant Downing refused to do so and the next day plaintiff filed PREA complaint against him. Dkt. 56 at 11. The complaint was assigned to non-party Michael Whiteley for investigation and the response was issued by defendant Hayes. Dkt. 82 at ¶¶ 4, 6. The complaint was found to be "unsubstantiated," meaning that the evidence was insufficient to determine whether the allegation was true or false. Dkt. 82 at ¶ 3.

### 4. January 21, 2021 Incident

On January 9, 2020, plaintiff completed her second housing review. Dkt. 80-1 at 5. The report states plaintiff can live with anyone but much prefers LGBTQ cellmates. Plaintiff had "no issues" to report and stated she was doing well.

On January 21, 2021, a prisoner was moved from plaintiff's unit because he and plaintiff had failed to maintain social distance. Dkt. 83 at ¶ 4. Later that day, plaintiff had a mental health emergency. Plaintiff states at approximately 11:30, she requested defendant Persell to contact mental health for a crisis intervention because she was having a mental health emergency. Dkt.

56 at 16. Plaintiff also requested that defendant DeHaven, the PREA Coordinator, be told

plaintiff no longer felt safe. *Id*.

Defendant Persell reports that his conversation with plaintiff was "around noon" and she

requested him to contact the PREA coordinator. Dkt. 85 at ¶3. Defendant Persell notified his

supervisor, defendant Jones, of plaintiff's request. *Id*. Defendant Jones states that defendant

Persell came to his office at approximately 12:10 to report plaintiff's request. Dkt. 83 at 2.

Defendant Jones contacted defendant DeHaven and was on the phone with him at 12:20 when he

heard an emergency radio call from defendant Persell, as plaintiff was having (in her words) "a

cataclysmic psychiatric decompensation." Dkt. 56 at 16. According to defendant Persell:

> Turner then around 12:20 began yelling and screaming in the dayroom. I celled
> the pod in while making notification to Master Control of the situation.
> Responding staff entered H-3 A-Pod and Turner went into the resource room and
> broke the filing cabinet, ripped a drawer out and fashioning a weapon with it.
> Turner then stated, "I will take out the first two or three of you mother fuckers
> that come in here." The emergency Response Team arrived on scene and with
> constant verbal directives, Turner put the weapon down and turned to cuff up. At
> this time, Turner was restrained and escorted from the unit by the Emergency
> Response Team.

Dkt. 85 at ¶ 3. Plaintiff was taken to medical (Dkt. 83-1 at 2), and was later placed in

administrative segregation. Dkt. 79-1 at 30. Plaintiff was issued a serious infraction for

threatening, refusing to disperse and destroying property. Dkt. 79-1 at 26.

Plaintiff was housed in administrative segregation between January 21, 2021 and April 5,

2021, pending her disciplinary hearing and the completion of a new custody facility plan. Dkt.

79-1 at 30–38. Plaintiff received multiple reviews of her administrative segregation placement:

she had an initial review on the day she was transferred (Dkt. 79-1 at 33), an intermediate review

on February 8, 2021 at which she submitted a written statement (*Id*. at 33–34), a final review on

February 19, 2021 (*Id*. at 35) and two extension reviews on February 22, 2021 and April 2, 2021

1  (*Id.* at 36–37). Plaintiff also appealed her placement in administrative segregation. Dkt. 92 at

2  101.

3  Plaintiff's disciplinary hearing took place on March 10, 2021. Dkt. 79-1 at 31. She was

4  kept in administrative segregation while her housing was determined. Dkt. 92 at 84. Although

5  some preparations were made for a possible transfer to the Washington Corrections Center for

6  Women ("WCCW") (Dkt. 79-1 at 32), ultimately it was determined that plaintiff would remain

7  at SCCC. Dkt. 79-1 at 44. At a March 17, 2021 meeting of the Facilities Management Review

8  Team to determine her housing, plaintiff stated she would like to stay at SCCC. *Id.*

9  On July 8, 2021, plaintiff had her third housing review. Plaintiff reported she was

10 comfortable in her housing assignment, gets along well with her cellmate and has no issues to

11 report; she stated she is still seeking housing at WCCW after completion of gender confirmation

12 surgery. Dkt. 80-1 at 9.

13                                                    **DISCUSSION**

14 **A.    Legal Standards**

15    1.  <u>Summary Judgment</u>

16 Summary judgment is appropriate when the "movant shows that there is no genuine

17 dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

18 Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The central issue is

19 "whether the evidence presents a sufficient disagreement to require submission to a jury or

20 whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at

21 251–52.

22 The moving party bears the initial burden of showing "that there is an absence of

23 evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

24 (1986). Where the moving party does not bear the burden at trial, it can carry its initial burden by

1  presenting evidence that negates an essential element of the nonmoving party's case, or by

2  establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden at

3  trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

4  Where the moving party bears the burden at trial, it can meet its initial burden by presenting

5  evidence sufficient to demonstrate that no reasonable trier of fact could find for the nonmoving

6  party; the evidence presented must establish beyond controversy every essential element of the

7  claim. *Southern Cal. Gas. Co. v. City of Santa Ana*, 336 F.3d 885, 888–89 (9th Cir. 2003).

8      If the moving party meets its initial responsibility, the burden then shifts to the

9  nonmoving party to establish a genuine issue of material fact for trial. *Matsushita Elec. Indus.

10  Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986). Genuine disputes are those for which

11  the evidence is such that a "reasonable jury could return a verdict for the nonmoving party."

12  *Anderson*, 477 U.S. at 257. Material facts are those which might affect the outcome of the suit

13  under governing law. *Id.* A mere scintilla of evidence is insufficient to create a factual dispute.

14  *Id.* at 252. Likewise, the nonmoving party cannot "defeat summary judgment with allegations in

15  the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v.

16  Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

17      A verified complaint, like plaintiff's, "may be treated as an affidavit to oppose summary

18  judgment to the extent it is based on personal knowledge and sets forth specific facts admissible

19  in evidence." *Keenan v. Hall*, 83 F.3d 1083, 1090 n.1 (9th Cir. 1996) (internal quotations

20  omitted); *see also Jones v. Blanas*, 393 F.3d 918, 922–23 (9th Cir. 2004). But allegations based

21  merely on the plaintiff's belief are insufficient to oppose summary judgment, as are unsupported

22  conjecture and conclusory statements. *See Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107,

23  1112 (9th Cir. 2003); *McElyea v. Babbitt*, 833 F.2d 196, 197–98 n.1 (9th Cir. 1987) (per curiam).

24

1    In ruling on a motion for summary judgment, the Court must draw all reasonable inferences in

2    favor of the nonmoving party, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, and may not weigh

3    the evidence or make credibility determinations, *Anderson*, 477 U.S. at 248.

4         When parties file cross-motions for summary judgment, as the parties have done here, each

5    motion "must be considered on its own merits." *Fair Hous. Council of Riverside County, Inc. v.*

6    *Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The court must review the evidence submitted

7    in support of each cross-motion. *Id.* And, although the parties may each assert there are no

8    uncontested issues of material fact, the Court must determine whether disputed issues of material

9    fact are present. *Id.*; *Osborn v. Butler*, 712 F. Supp. 2d 1134, 1148 (D. Idaho 2010). [4]

10       2.  Section 1983 Standard

11        To sustain a § 1983 civil rights claim, plaintiff must show (1) she suffered a violation of

12   rights protected by the Constitution or created by federal statute, and (2) the violation was

13   proximately caused by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48

14   (1988); *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of

15   § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act,

16   participated in another's affirmative act, or omitted to perform an act which he was legally

17   required to do that caused the deprivation complained of. *Arnold v. Int'l Bus. Machines*, 637 F.2d

18   1350, 1355 (9th Cir. 1981).

19        "The inquiry into causation must be individualized and focus on the duties and

20   responsibilities of each individual defendant whose acts or omissions are alleged to have caused

21

22   _____

23        [4] Plaintiff misapprehends the applicable standard in her response to defendants' cross-motion, asserting defendants bear the burden of proof at trial and she is not required to adduce evidence to avoid summary judgment. Dkt. 92 at 2–3. To the contrary, it is plaintiff who bears the burden of proving her claims at trial, and, in order to defeat defendants' cross-motion for summary judgment, she must establish the existence of a genuine issue of material fact for trial. *Matsushita*, 475 U.S. at 585-87.

24

a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). Vicarious

liability may not be imposed on  supervisory employees for the acts of their subordinates in an

action brought under 42 U.S.C. § 1983. *Lemire v. California Dep't of Corr. & Rehabilitation*,

726 F.3d 1062, 1074 (9th Cir. 2013). A supervisor may be held liable under § 1983 only "if he or

she was personally involved in the constitutional deprivation or a sufficient causal connection

exists between the supervisor's unlawful conduct and the constitutional violation."  *Jackson* v.

*City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001).

**B.    Personal Participation**

As an initial matter, defendants contend plaintiff has failed to adduce evidence that eight

of the named defendants (defendants Cherry, Hawks, Headley, DeHaven, Klemme, Penrose,

Thrasher and Sinclair) personally participated in the alleged violations of her rights.

Defendants first argue plaintiff alleges no conduct by defendants Cherry, Hawks and

Headley except their review or processing of plaintiff's grievances regarding the denial of her

request to be housed with inmate Horn. Dkt. 78 at 13. This, defendants argue, is insufficient to

establish their personal participation in any violation of plaintiff's rights.

The record shows defendant Cherry completed the level II investigation of plaintiff's

grievance (with the ultimate response signed by defendant Haynes), and defendant Headley

reviewed and responded to plaintiff's grievance at Level III. Dkt. 84-1 at 38; Dkt. 84-1 at 43. But

the mere denial of a grievance cannot, without evidence a defendant directly participated,

encouraged, authorized or acquiesced in the claimed harm, render a defendant liable for an

alleged constitutional violation. *Johnson v. Hayden*, 2012 WL 652586, at *3 (D. Or. Feb. 10,

2012) (citing *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (it is not unconstitutional to

merely deny a grievance)); *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) ("[I]nmates

lack a separate constitutional entitlement to a specific prison grievance procedure."). Plaintiff has

1  submitted no evidence of any such participation by defendants Cherry and Headley beyond their

2  participation in the grievance process, and has therefore failed to support her claims against

3  them.

4        Defendant Hawks, however, signed the denial of plaintiff's cell change request. Dkt. 75-1

5  at 406. While the reason provided for the denial indicates the decision was made "per Ralkey

6  PREA coord[inator]," it was defendant Hawks who ultimately signed the denial. *Id*. Thus, in

7  addition to his role in investigating plaintiff's grievance, defendant Hawks also personally

8  participated in the underlying decision the grievance challenged.

9        Defendants next assert plaintiff's only allegations against defendant DeHaven arise out of

10  his processing of her PREA complaint against defendant Downing. Defendant DeHaven avers

11  that, pursuant to DOC policy for processing PREA claims, his only role in plaintiff's complaint

12  was to process paperwork and to inform plaintiff of the outcome. Dkt. 82 at ¶ 8. Although

13  plaintiff speculates defendant DeHaven's role was greater, she provides no evidence. Instead, the

14  evidence shows defendant DeHaven neither investigated nor decided plaintiff's claim; the claim

15  was assigned to a non-defendant investigator and was decided by defendant Haynes. Dkt. 82 at

16  ¶ 6; Dkt. 82-1. The record demonstrates defendant DeHaven's role was, essentially, clerical;

17  there is no evidence he personally participated in any alleged violation of plaintiff's rights.

18        Finally, defendants contend plaintiff's allegations against defendants Penrose, Klemme,

19  Thrasher and Sinclair assert only supervisory liability which, they argue, is insufficient to

20  establish personal participation.

21        Plaintiff's complaint makes no factual allegations whatever about defendants Klemme

22  and Sinclair. Indeed, their names are mentioned in the second amended complaint only in legal

23  conclusions which allege no facts. Dkt. 56 at 32. The dearth of facts pertaining to these

24

1  defendants suggests plaintiff named them as defendants based solely on their supervisory

2  responsibilities or positions—which is not permissible in an action brought under § 1983. *Monell*

3  *v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691–94 (1978). In the absence of any

4  allegations—let alone any evidence—that defendants Klemme and Sinclair personally

5  participated in conduct violating plaintiff's rights, plaintiff cannot state a claim against them.

6         With respect to defendant Penrose, plaintiff has submitted a discovery response in which

7  defendant Penrose admits she engaged in communications with defendant Ralkey regarding

8  plaintiff's housing after the conclusion of plaintiff's disciplinary hearing, including "direct[ing]

9  Defendant Ralkey to hold Plaintiff in the Restrictive Housing Unit until the classification process

10 and prohibited placement request were finalized through Headquarters." Dkt. 92 at 84. The

11 record, therefore, establishes defendant Penrose's personal participation in defendants' decision

12 to continue plaintiff's restrictive housing. Plaintiff therefore supports her claims against

13 defendant Penrose with more than mere supervisory liability.

14        Similarly, the record reflects defendant Thrasher participated in approving at least one of

15 the housing assignments plaintiff challenges. *See, e.g.*, Dkt. 86-1 at 2. Accordingly, plaintiff's

16 claims against defendant Thrasher do not depend solely upon vicarious liability for the acts of his

17 staff.

18        The Court recommends plaintiff's claims against defendants Cherry, Headley, DeHaven,

19 Klemme and Sinclair be dismissed with prejudice for lack of personal participation. Dismissal on

20 this ground is not appropriate as to defendants Hawks, Penrose and Thrasher, because the record

21 shows their personal participation in the decisions challenged by plaintiff.[5]

22

23  _____

24        [5] However, as discussed below, the Court concludes that plaintiff's substantive claims—including the
    claims against defendants Hawks, Penrose and Thrasher—should be dismissed for other reasons on the merits.

1    **C.    Eighth Amendment Failure to Protect**

2        Plaintiff alleges defendants Ralkey and Thornhill[6] failed to protect her from being housed

3    with cellmates she considered unsafe and denied housing with a cellmate of her choice with

4    whom she felt comfortable. Dkt. 56 at 21–23. Plaintiff contends defendant Downing violated her

5    eighth amendment rights by refusing to refer to her using female pronouns after she requested

6    that he do so. *Id*. at 26. Plaintiff alleges defendants Jones and Persell failed to protect her during

7    a mental health breakdown when they did not contact a mental health provider as she had

8    requested. *Id*. at 28. Finally, plaintiff asserts defendants Penrose, Thrasher and Haynes[7] violated

9    the Eighth Amendment by holding plaintiff in administrative segregation, and in their decision

10   not to transfer her to a women's prison facility. *Id*. at 29–32.

11       The Eighth Amendment imposes a duty upon prison officials to provide humane

12   conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). This duty includes

13   ensuring that inmates receive adequate food, clothing, shelter, and medical care, and taking

14   reasonable measures to guarantee the safety of inmates. *Id*.

15       In cases alleging a constitutional violation based on a failure to prevent harm, the plaintiff

16   must first meet an objective component by showing "[s]he is incarcerated under conditions

17   posing a substantial risk of serious harm." *Id*. at 834; *see Clouthier v. Cty. of Contra Costa*, 591

18   F.3d 1232, 1242 (9th Cir. 2010), *overruled on other grounds, Castro v. Cty. of Los Angeles*, 833

19   F.3d 1060 (9th Cir. 2016). A plaintiff must also meet a subjective component by showing the

20   prison official acted with deliberate indifference to inmate health or safety. *Farmer*, 511 U.S. at

21

22   _____

23       [6] Plaintiff also includes defendants Cherry, Headley and DeHaven in her claim for the denial of her cellmate request. As discussed above, the Court has recommended dismissal of these defendants for the separate reason that plaintiff has not established their personal participation in the alleged violation.
         [7] Plaintiff also includes defendants Sinclair and Klemme in this claim. The Court has separately

24   recommended their dismissal for lack of personal participation.

1    834; *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("[A] claim that a prisoner's confinement

2    violate[s] the Eighth Amendment requires an inquiry into the prison officials' state of mind.").

3    "[A] prison official cannot be found liable under the Eighth Amendment . . . unless the official

4    knows of and disregards an excessive risk to inmate health or safety; the official must both be

5    aware of facts from which the inference could be drawn that a substantial risk of serious harm

6    exists, and he must also draw the inference." *Farmer*, 511 U.S. at 832; *see also Wallis v.*

7    *Baldwin*, 70 F.3d 1074, 1077 (9th Cir. 1995). A prison official's "failure to alleviate a significant

8    risk he should have perceived but did not," therefore, cannot "be condemned as the infliction of

9    punishment." *Farmer*, 511 U.S. at 838.

10            1.    2019 Housing Assignments

11           Plaintiff alleges defendants Ralkey and Thornhill violated her Eighth Amendment rights

12    by placing her with incompatible cellmates she believed posed a risk of harming her, in

13    assignments made on May 28, 2019, July 15, 2019, July 26, 2019 and "approximately 9/2019."

14    Dkt. 56 at 5–8. Defendants contend plaintiff has not adduced evidence demonstrating defendants

15    Ralkey and Thornhill subjectively knew of and disregarded an excessive risk to plaintiff's safety,

16    and that in any event plaintiff has failed to establish she was harmed by the cellmate

17    assignments.

18           Plaintiff has not submitted evidence demonstrating defendants knew of and disregarded

19    plaintiff's safety concerns with respect to the May 28 cell move. Plaintiff filed a grievance

20    asserting her newly assigned cellmate had "issues with homosexual/trans people" because he was

21    Muslim, and that there were "STG [Security Threat Group] concerns between the two of us."

22    Dkt. 84-1 at 2. However, the investigation of this grievance revealed that no defendant was

23    aware of any STG concerns, and plaintiff had not made known to any defendant her transgender

24

1    status at the time of the cell assignment. *Id*. at 6, 8, 9. Once plaintiff's concerns were known, she

2    was moved to another cell. *Id*. at 8, 10.

3          Plaintiff also filed a grievance regarding her July 15 cellmate assignment. Dkt. 84-1 at

4    17. But this grievance did not raise any safety concerns; instead, plaintiff asserted only that

5    proper PREA process had not been followed. *Id*. Once plaintiff was informed that defendant

6    Ralkey had reviewed the move, as required by DOC's PREA procedures, she withdrew the

7    grievance. *Id*. Plaintiff alleges she informed her mental health provider, Melvin Coplin, of her

8    safety concerns regarding this move and contends Mr. Coplin passed this information on to

9    defendants Ralkey and Thornhill. Dkt. 56 at 7. However, the record contains no such

10   communication regarding plaintiff's July 15 cellmate assignment.[8] Furthermore, defendant

11   Ralkey denies plaintiff complained to her about any cellmate assignments and recalls no contact

12   from plaintiff. Dkt. 81-1 at 4. The Court therefore finds plaintiff has not submitted evidence

13   establishing defendants knew of, and disregarded, a substantial risk of serious harm regarding the

14   July 15 cellmate assignment.

15         The record contains no documentation of grievances with respect to any subsequent

16   cellmate assignment. Plaintiff's DOC records show assignments made on July 15, July 30 and

17   August 27 were all subjected to PREA risk assessment and each cellmate's risk score was

18   examined and found compatible with plaintiff's risk score; each was approved by defendant

19   Ralkey. Dkt. 86-1 at 4. Plaintiff, however, alleges she "expressed pain and anguish" regarding

20   the assignment made "on or about July 26" and another assignment made "on or about 9/2019,"

21

22   _____

23         [8] The record contains an email from Mr. Coplin dated August 27, 2019. But this email does not appear to
     address the July 15 cell assignment. Rather, its primary thrust is to express support for plaintiff's affirmative request
     (first made in August, 2019) to be housed with inmate Horn. Dkt. 82-1 at 11; Dkt. 56 at 8. Further, while expressing
     an opinion that the then-current assignment was "counterintuitive" Mr. Coplin's email does not express a concern
24   that plaintiff was endangered. *Id*.

1    and "defendants Thornhill and Ralkey ignored my plea for help." Dkt. 56 at 8. This statement is

2    broad and conclusory and conflicts with defendant Ralkey's statement that she recalls no

3    concerns raised by plaintiff. Dkt. 81-1 at 4. Nonetheless, drawing inferences in plaintiff's favor,

4    the Court concludes there are issues of fact as to defendants' knowledge of plaintiff's safety

5    concerns regarding the July 30 and August 27 cellmate assignments.

6           However, plaintiff has failed to establish that she suffered cognizable harm caused by any

7    of the cell assignments, including those on July 30 and August 27. Plaintiffs who allege

8    deliberate indifference "must . . . demonstrate that the defendants' actions were both an actual

9    and proximate cause of their injuries." *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d

10   1062, 1074 (9th Cir. 2013). But a plaintiff alleging only generalized fear of harm from fellow

11   inmates does not establish injury under the Eighth Amendment. *Williams v. Wood*, 223 F.App'x

12   670, 671 (9th Cir. 2007).

13          Here, plaintiff does not allege she was assaulted, or even threatened with assault, by any

14   of her cellmates. Instead, she alleges only a generalized and wholly speculative fear that an

15   assault *might* occur. This is insufficient to state an Eighth Amendment claim. A "mere suspicion

16   that an attack will occur" is not enough to support a cognizable Eighth Amendment claim. *Berg*

17   *v. Kincheloe,* 794 F.2d 457, 459 (9th Cir.1986). This is because "speculative and generalized

18   fears of harm at the hands of other prisoners do not rise to a sufficiently substantial risk of

19   serious harm." *Williams*, 223 F.App'x at 671. *See also Morgan v. MacDonald*, 41 F.3d 1291,

20   1293–94 (9th Cir. 1994) (plaintiff failed to state a claim because "[his] complaint contains no

21   allegations that he was ever subjected to retaliation at the hands of his fellow inmates, nor does it

22   provide any basis for inferring [defendant] was aware that his actions exposed [plaintiff] to a

23   substantial risk of serious harm"). Plaintiff has not adduced facts demonstrating more than

24

1   speculative harm from her 2019 cellmate assignments, which is insufficient to state an Eighth

2   Amendment claim.

3       The Court recommends plaintiff's Eighth Amendment claims regarding plaintiff's 2019

4   cellmate assignments be dismissed.

5       2.    <u>Cellmate of Choice</u>

6       Plaintiff alleges defendants Ralkey, Thornhill and Hawks violated the Eighth

7   Amendment by denying her request to be housed with her cellmate of choice, inmate John Horn,

8   when plaintiff's mental health provider had expressed his support of the request. Dkt. 56 at 21–

9   23. Defendants contend plaintiff's claim fails as a matter of law because there is no constitutional

10  right to a cellmate of choice.

11      "While the Eighth Amendment requires prison officials to provide prisoners with the

12  basic human needs, including reasonable safety, it does not require that the prisoners be

13  comfortable and provided with every amenity." *Allen v. Figueroa*, 56 F.3d 70 at *7 (9th Cir.

14  1995) (citing *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982)). Consequently, a prisoner

15  "has no Eighth Amendment or due process right to be allowed to choose his cellmate for

16  compatibility." *Id. See also Allen v. Purkett*, 5 F.3d 1151, 1153 (8th Cir. 1993) (per curiam) (no

17  due process right to be housed with certain inmates); *Harris v. Greer*, 750 F.2d 617, 618 (7th

18  Cir. 1984) ("an inmate has of course no constitutional right to the cellmate . . . of his choice.").

19  This is so even if an inmate's cellmates were "annoying, offensive, strange, rude," or otherwise

20  undesirable living companions. *Blue v. Knowlin,* No. 2:09–1629 CMCRSW, 2009 WL 2843315,

21  at *4 (D.S.C. Aug.31, 2009).

22      Plaintiff contends defendants acted with deliberate indifference because her mental health

23  provider had recommended approving inmate Horn as a compatible cellmate. Dkt. 56 at 4; Dkt.

24  82-1 at 11. But as defendants note, defendant Ralkey denied the request based upon separate,

confidential, PREA information that was unavailable to plaintiff's mental health provider. Dkt.

75-1 at 406, Dkt. 81-1 at 5.[9] Furthermore, "the fact that one staff member recommended certain

housing arrangements . . . does not imply that medical harm would result if that recommendation

was not followed." *Moots v. Lombardi,* 453 F.3d 1020, 1022 (8th Cir. 2006) (dismissing Eighth

Amendment claim for denial of cellmate recommended by mental health provider where plaintiff

never voiced concerns about a specific threat to his safety.).

Plaintiff has no constitutional right to the cellmate of her choice. The Court recommends

her claims based upon the denial of her request to be housed with inmate Horn be dismissed.

### 3.    Use of Male Pronouns

Plaintiff contends her Eighth Amendment rights were violated by defendant Downing's

refusal to refer to her with female pronouns and terminology, even after she informed him of her

preferences. Dkt. 56 at 25. Defendants contend that prisoners have no constitutional right to be

free from insulting statements. Dkt. 78 at 19.

Allegations of verbal harassment or abuse do not state a constitutional deprivation under

§ 1983. *Freeman v. Arpaio*, 125 F.3d 732, 738 (9th Cir. 1997), *abrogated on other grounds by*

*Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008) (prison officials' abusive language

towards Muslim inmates insufficient to establish equal protection violation). Disrespectful, and

even assaultive, comments by prison guard are insufficient to implicate the Eighth Amendment.

*Keenan*, 83 F.3d at 1092; s*ee also Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987)

(use of vulgar language does not violate a constitutional right); *Ellingburg v. Lucas*, 518 F.2d

1196, 1197 (8th Cir. 1975) (prisoner does not have cause of action under § 1983 for being called

---

[9] Plaintiff makes the bald assertion that this information was "fabricated." Dkt. 92 at 5. Defendant Ralkey has attested that she did have such information. Dkt. 81-1 at 5. Plaintiff's conclusory assertion, made without personal knowledge, is insufficient to avoid summary judgment. *Hernandez*, 343 F.3d at 1112.

obscene name by prison employee). Indeed, even when such insults reach the level of sexual

harassment, they are not sufficient to support an Eighth Amendment claim. *Austin v. Terhune*,

367 F.3d 1167, 1171 (9th Cir. 2004) ("[a]lthough prisoners have a right to be free from sexual

abuse, whether at the hands of fellow inmates or prison guards, . . . the Eighth Amendment's

protections do not necessarily extend to mere verbal sexual harassment.").

Plaintiff alleges defendant Downing refused to acknowledge her as female and continued

to use male pronouns after she requested he stop doing so. Dkt. 56 at 11. In her reply materials,

plaintiff also asserts than another unidentified defendant referred to her as an "abomination."

Dkt. 92 at 11. But plaintiff alleges no more than the use of insulting language. As a matter of

law, insulting and offensive statements—no matter how objectionable—are not sufficient to

support a constitutional violation. *Freeman*, 125 F.3d at 738. Plaintiff cannot establish an Eighth

Amendment claim against defendant Downing for his use of male pronouns.

4.    Housing in Administrative Segregation

Plaintiff next contends defendants Penrose, Thrasher and Hayes violated her Eighth

Amendment rights by confining her in administrative segregation because, while there, plaintiff

was subjected to "harassment and misgendering" and was not afforded shower facilities that

protected her privacy. [10] Dkt. 56 at 30–31. Plaintiff likewise contends the same defendants

violated the Eighth Amendment by failing to transfer her to a women's prison.

Plaintiff was confined in administrative segregation for a limited period of time while her

infraction proceeding was investigated and heard, and while her post-infraction housing was

finalized. She entered segregation on January 21, 2021 and was released to the general

---

[10] Plaintiff also alleges Fourteenth Amendment due process claims arising from her assignment to administrative segregation. Dkt. 56 at 30–31. Those claims are discussed below.

1   population at SCCC on April 5, 2021—a period of 81 days. Dkt. 79-1 at 30–38. Plaintiff asserts

2   she suffered harassment during that period, but she has submitted no evidence that defendants

3   Penrose, Thrasher and Hayes had knowledge of her complaints.

4          The record contains only one grievance raising issues of harassment in administrative

5   segregation—Log I.D. Number 21726110, which complains staff and inmates have referred to

6   her with derogatory terms. Dkt. 84-1 at 47. But this grievance was never presented to or seen by

7   any of the defendants. Because it was rejected at Level 0 as non-grievable, the grievance was not

8   reviewed by any staff except non-defendant Grievance Coordinator Dahne. Dkt. 84 at 3. Plaintiff

9   also avers that she sent several medical kites to Mental Health "concerning the harassment [she

10  is] suffering," but provides no evidence that defendants Penrose, Thrasher and Hayes received

11  notice of these.[11]

12         Plaintiff also contends she was forced to shower within view of other inmates while in

13  administrative segregation. Dkt. 75 at 30. However, defendants Haynes and Penrose responded

14  under oath in written discovery that a shower curtain was available for screening. Dkt. 75-1 at

15  81-82; Dkt. 92 at 78. Plaintiff strenuously disputes this, asserting in her briefing that "there is no

16  concealing curtain. Period" Dkt. 92 at 7. But even if the Court were to accept this assertion as

17  evidence, it is insufficient to defeat summary judgment. This is because an issue of fact must be

18  material—and here, the material fact is the subjective knowledge of defendants, not plaintiff's

19  understanding. [12] Defendants' evidence shows they believed a shower curtain was available—

20  and it is their subjective mental state that is at issue. A reasonable jury could not find defendants

21

22         [11] Plaintiff refers to and has attached two documents purporting to be these kites, but they are almost
    completely illegible. Dkt. 75-1 at 412, 413.

23         [12] The Court notes that DOC policy provides that transgender inmates "may report verbally or in writing
    housing/showering issues or concerns to the Superintendent[.]" Dkt. 79-1 at 15. There is no evidence plaintiff did so

24  here.

1    knew of, and disregarded, a serious risk to plaintiff's safety during her confinement in

2    administrative segregation. *Farmer*, 511 U.S. at 832.

3        5.    Transfer to Women's Prison

4        Plaintiff's claim that defendants Penrose, Thrasher and Hayes acted with deliberate

5    indifference in not transferring her to a women's prison similarly fails.

6        First, prisoners have no constitutional right to avoid being transferred to another prison,

7    or to be housed in a particular institution. *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983);

8    *Meachum v. Fano*, 427 U.S. 215, 225-27 (1976); *United States v. Brown*, 59 F.3d 102, 105 (9th

9    Cir. 1995) (per curiam). There is no constitutional right to incarceration at a prison of plaintiff's

10   choice. *Williams*, 223 F.App'x at 671; s*ee also Rizzo v. Dawson*, 778 F.2d 527, 530 (9th Cir.

11   1985) (due process protections generally do not apply when prison officials change an inmate's

12   place of confinement, "even though the degree of confinement may be different and prison life

13   may be more disagreeable in one institution than in another"); *Aliahmed v. Troxler*, 839 F.App'x

14   675, 677 (3d Cir. 2021) (because transgender plaintiff lacked a cognizable liberty interest in

15   being confined in a particular institution, she was unlikely to succeed on claim for injunctive

16   relief to transfer to a women's prison).

17       Second, the evidence shows plaintiff has taken conflicting and inconsistent positions on

18   her confinement at SCCC. While in some communications plaintiff expressed a preference to be

19   transferred to a women's facility (*see, e.g.* Dkt. 84-1 at 47), in other communications plaintiff

20   indicated she felt "safe" at SCCC (*see, e.g.* Dkt. 80-1 at 3). Indeed, plaintiff objected to a

21   proposed "facility prohibition" from SCCC and asked whether she could "sign a behavior

22   contract to stay here at SCCC." Dkt. 92 at 97, 107. And during her periodic housing reviews,

23   plaintiff has expressed satisfaction with her placement at SCCC, including reporting in June,

24   2021 she was "comfortable in [her] housing assignment," although "still seeking housing at

WCCW after completion of Gender Confirmation Surgery." Dkt. 80-1 at 10. *See also* Dkt. 79-1 at 44 (note from March 17, 2021 Facilities Management Review Team meeting indicating plaintiff stated she "would like to stay at SCCC").

Thus, even if there were an Eighth or Fourteenth Amendment right to the prison of plaintiff's choice, plaintiff cannot demonstrate defendants acted with a mental state of deliberate indifference in light of her statements affirming her comfort at SCCC and seeking to stay there. The Court recommends plaintiff's claims for failure to transfer her to another facility be denied.

6.    Response to January 21, 2021 Incident

Finally, plaintiff contends defendants Persell and Jones violated her Eighth Amendment rights by failing to contact a mental health provider as she had requested on January 21, 2021. Dkt. 56 at 28.

Both parties cite to the statements defendants submitted in connection with the events of that day. Defendant Persell states that on January 21, 2021 "around noon" plaintiff told him she was "experiencing a mental health emergency and to contact the PREA coordinator." Dkt. 85 at 2; Dkt. 92 at 140. Defendant Persell "notified CUS Jones what was said." *Id.* Then, "[a]t 12:20 offender Turner began yelling and screaming in the dayroom." *Id.* Defendant Persell then focused upon addressing the emergent situation, including "cell[ing] the pod" and informing Master Control of the situation; ultimately, the Emergency Response Team succeeded in getting plaintiff to put down the weapon she had fashioned from a metal file cabinet and to "cuff up." *Id.*

Defendant Jones reports he first heard of plaintiff's request at approximately 12:10 pm when defendant Persell came to his office to inform him plaintiff requested an emergency meeting with the PREA coordinator, defendant DeHaven. Dkt. 83 at 2. While he was speaking with defendant DeHaven, defendant Jones heard a call from defendant Persell's radio describing

1    an emergency with plaintiff refusing to disperse. *Id*. At this point, defendant Jones ended the

2    phone call in order to respond to the emergency. *Id*.

3        Plaintiff's narrative begins slightly earlier—though her various reports have somewhat

4    differing timelines. In her complaint, plaintiff states she first asked defendant Persell to contact

5    mental health at "approximately 11:30 am." Dkt. 56 at 16.[13] Plaintiff "also requested that

6    [defendant Persell] inform defendant DeHaven that I no longer felt safe in the H3 living unit." *Id*.

7    From there, the timeline of plaintiff's account matches defendants': she agrees that at

8    approximately 12:20 pm, she "had a cataclysmic psychiatric decompensation" leading to the

9    conduct for which she was infracted. *Id*.

10        Plaintiff points to DOC Policy 630.500, which provides that staff "will" notify the onsite

11    mental health provider when an inmate declares a "mental health emergency" and expresses

12    "acute mental health symptoms." Dkt. 75-1 at 295. Plaintiff states that is exactly what she did on

13    January 21: she declared a mental health emergency and requested a mental health professional

14    be contacted because she was "experiencing acute symptoms that required an emergency mental

15    health intervention." Dkt. 56 at 16. Plaintiff argues defendants violated her Eighth Amendment

16    rights by failing to summon mental health assistance for her during her emergency, as DOC

17    policy requires them to do. *Id*. at 56.

18        The record indicates that both defendants focused on plaintiff's request to contact

19    defendant DeHaven, and neither tried to reach a mental health professional. Dkt. 85 at 2; Dkt. 83

20    at 5. It therefore appears that defendants' response may not have been in compliance with DOC

21

22    _____

23        [13] Plaintiff also lists 11:30 as the approximate time of the "incident" in a grievance she later filed. Dkt. 84-1
     at 45. A statement submitted by plaintiff's mental health provider indicates plaintiff told him she requested the desk
     officer to contact Mental Health at noon. Dkt. 75-1 at 417. A third, unsigned, statement from plaintiff places the

24    time of all of the events one hour earlier. Dkt. 75-1 at 364.

policy 630.500. But that does not mean they were deliberately indifferent to the risk of harm to plaintiff. Instead, they both immediately responded to plaintiff's statement that she did not feel safe—defendant Persell by notifying his supervisor, and defendant Jones by immediately contacting PREA officer DeHaven. *Id*. Then, before more could be done, plaintiff created an emergency situation to which they both had to redirect their attention. While in hindsight it might have been more helpful to contact mental health before reaching out to the PREA coordinator— that is not the standard the Court must apply in evaluating an Eighth Amendment claim.

Under the undisputed facts presented by both sides, plaintiff declared an emergency and requested both a mental health professional and the PREA coordinator; defendants promptly began responding to one of the requests, but were then pulled off that task by the need to respond to plaintiff's violent behavior. The Court finds a reasonable trier of fact could not find defendants were deliberately indifferent to a serious risk of harm to plaintiff. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

The Court recommends plaintiff's Eighth Amendment claims against defendants Persell and Jones be dismissed.

**D.     First Amendment Retaliation**

Plaintiff alleges all defendants have "chilled" her expression of her transgender identity in violation of the First amendment. *See, e.g.* Dkt. 56 at 22. Construing plaintiff's claim liberally, it appears she is alleging a claim for retaliation.

A First Amendment retaliation claim in the prison context has five basic elements: "(1) An assertion that a state actor took some adverse action against an inmate, (2) because of, (3) that prisoner's protected conduct, and that such action, (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005). To prevail on a retaliation

1    claim, "a plaintiff must show that his protected conduct was the substantial or motivating factor

2    behind the defendant's conduct." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (citation

3    and internal quotation omitted). In addition, a plaintiff "bears the burden of pleading and proving

4    the absence of legitimate correctional goals for the conduct of which he complains." *Pratt v.*

5    *Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). The Court evaluates a retaliation claim in light of the

6    deference accorded prison officials. *Id*. at 807.

7        With respect to each defendant, plaintiff alleges virtually the same claim: "Defendant . . .

8    fail[ed] to take reasonable steps to alleviate plaintiff's distress thereby denying plaintiff fair

9    application of prison regulations, which is an action taken to chill or silence plaintiff's

10   expression of being a transgender person, causing a violation of plaintiff's first amendment

11   rights." Dkt. 56 at 22–23. *See also* Dkt. 75 at 24 (Plaintiff's summary judgment motion, asserting

12   the "actions and inactions of Defendants have been an attempt to chill [plaintiff's] expression of

13   being transgender, so that she may receive fair treatment.")

14       Although it is not entirely clear, it appears plaintiff claims her "protected activity" is

15   simply her transgender identity. But plaintiff has not established any causal link between any

16   protected activity and any adverse action by the defendants. *Watison v. Carter*, 668 F.3d 1108,

17   1114 (9th Cir. 2012) (to state a retaliation claim, "the plaintiff must allege a causal connection

18   between the adverse action and the protected conduct"). Plaintiff does not identify any concrete

19   action taken by any defendant—and provides mere speculation that whatever defendants did was

20   motivated by retaliation. Plaintiff has supplied no facts, other than her own bald assertion, that each

21   of the defendants took some action (or declined to take some action) because of her transgender

22   status. This is insufficient to defeat a motion for summary judgment. *Barstad v. Dep't. of*

23   *Corrections*, 2015 WL 1867082, at *26-27 (W.D. Wash. April 23, 2015) (granting summary

24

1  judgment for defendant where prisoner plaintiff failed to present admissible evidence showing

2  defendant issued infractions based on a motivation to retaliate); *Watts v. Ruggiero*, 2016 WL

3  916233, at *20 (E.D. Cal. March 20, 2016) (granting summary judgment when a prisoner

4  plaintiff provided no evidence to support his allegation that he was retaliated against or to rebut

5  the defendant's sworn statement).

6        The Court recommends plaintiff's retaliation claim be dismissed.

7  **E.    Fourteenth Amendment Equal Protection Claims**

8        Plaintiff alleges she has been denied equal protection by defendant Downing's refusal to

9  use her preferred pronouns (Dkt. 56 at 25) and by the denial by defendants Ralkey, Thornhill and

10  Hawks to permit her the "privilege of housing with a friend" (Dkt. 75 at 28).

11        "To state a § 1983 claim for violation of the Equal Protection Clause, a plaintiff must

12  show that [s]he was treated in a manner inconsistent with others similarly situated, and that the

13  defendants acted with an intent or purpose to discriminate against the plaintiff based upon

14  membership in a protected class." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1166–67 (9th

15  Cir. 2005) (internal quotations omitted). To allege an equal protection violation based on race or

16  other protected status, plaintiff "must show that the defendant acted with an intent or purpose to

17  discriminate against [her] based upon [her] membership in a protected class. Intentional

18  discrimination means that a defendant acted at least in part *because* of a plaintiff's protected

19  status." *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003) (citations and quotations

20  omitted).

21        Plaintiff's only allegation of conduct by defendant Downing is his use of language

22  plaintiff found offensive. Dkt. 56 at 10–11. As discussed above, the constitution does not protect

23  prisoners from the use of insulting language. *Freeman*, 125 F.3d at 738. And while the use of

24

1  offensive language could be evidence of discriminatory intent behind some other action, it is not,

2  in itself, a sufficient basis for an equal protection claim. *Id*. at 738 & n.6.

3    Plaintiff's claim regarding the denial of her cellmate of choice also fails. Plaintiff has

4  submitted no evidence showing a discriminatory motive for the denial. On the contrary,

5  defendants have submitted evidence that the denial was due to confidential PREA information.

6  Dkt. 81-1 at 5. Plaintiff supplies no evidence—but only speculation and conclusory statements—

7  to support her assertion of a discriminatory motive. Dkt. 75 at 28.

8    The Court recommends plaintiff's equal protection claims be dismissed.

9  **F.    Fourteenth Amendment Due Process Claims**

10    Plaintiff alleges defendants violated her due process rights by (1) failing to follow prison

11  policies; (2) "needlessly prolonging" her assignment to administrative segregation; and (3)

12  denying and/or improperly processing her grievances.

13    1.    Failure to Follow Policies

14    Plaintiff alleges defendants Ralkey and Thornhill "fail[ed] to follow prison regulations,

15  which is both an action in violation of RCW 72.09.135[14] and an action that denied plaintiff her

16  due process and equal protection rights." Dkt. 56 at 21, 23. Plaintiff also alleges all defendants

17  "den[ied] plaintiff fair application of prison regulations." *Id*. at 22. Plaintiff's claims fail as a

18  matter of law.

19    State policies and regulations are "not designed to confer rights on inmates," but are

20  instead "primarily designed to guide correctional officials in the administration of a prison."

21

22  _____

23    [14] RCW 72.09.135 requires the DOC to adopt minimum standards for prison operations. Nothing in the statute indicates that it creates a private right of action under either state or federal law. Neither party discusses this statute or treats it as a separate claim. To the extent any claim is cognizable under this statute, the Court

24  recommends declining to exercise supplemental jurisdiction over it. 28 U.S.C. § 1367(c)(3).

1    *Sandin v. Conner,* 515 U.S. 472, 481–82 (1995). Although "[p]rison regulations governing the

2    conduct of correctional officers" are "relevant in determining whether an inmate's right was

3    clearly established," they do not confer rights. *Furnace v. Sullivan,* 705 F.3d 1021, 1027 (9th Cir.

4    2013) (citations and internal quotation marks omitted); *see also Parra v. PacifiCare of Arizona,*

5    *Inc.,* 715 F.3d 1146, 1154 (9th Cir. 2013) ("Language in a regulation may invoke a private right

6    of action that Congress through statutory text created, but it *may not create a right* that Congress

7    has not.") (emphasis added; citation and internal quotation marks omitted). Thus, plaintiff has no

8    separate constitutional claim for defendants' alleged violations of DOC policies.

9        The Court recommends plaintiff's claims for failure to follow prison policies be

10   dismissed.

11       2.    <u>Administrative Segregation</u>

12       Plaintiff alleges defendants Penrose, Thrasher and Haynes violated her right to due

13   process in continuing her confinement in administrative segregation beyond the period she

14   claims is specified in DOC policies. Dkt. 56 at 19–20.

15       Pursuant to the Due Process Clause of the Fourteenth Amendment, "no state shall

16   'deprive any person of life, liberty, or property without due process of law.'" *Toussaint v.*

17   *McCarthy*, 801 F.2d 1080, 1089 (9th Cir. 1986), *overruled on other grounds*, *Sandin*, 515 U.S.

18   472. The due process guarantees of the Fourteenth Amendment thus "apply only when a

19   constitutionally protected liberty or property interest is at stake." *Tellis v. Godinez*, 5 F.3d 1314,

20   1316 (9th Cir. 1993).

21       Ordinarily, administrative segregation in and of itself does not implicate a protected

22   liberty interest. *See Sandin*, 515 U.S. at 485–86. However, the ultimate inquiry is whether the

23   confinement imposes an atypical and significant hardship. *See id.* at 483–84; *Serrano*, 345 F.3d

24   at 1079. Determining whether a prison condition is "atypical and significant" requires

consideration of the specific facts of each case. *Keenan,* 83 F.3d at 1089. Courts consider three

guideposts in framing the inquiry: (1) whether the challenged condition mirrored those

conditions imposed upon inmates in administrative segregation and protective custody, and thus

comported with the prison's discretionary authority; (2) the duration of the condition and the

degree of restraint imposed; and (3) whether the state's action will invariably affect the duration

of the prisoner's sentence. *Serrano*, 345 F.3d at 1078.

Here, plaintiff's segregation was for the limited duration of 81 days. While plaintiff

contends this was "needlessly prolonged" (Dkt. 56 at 30), courts have found considerably longer

segregation periods insufficient to trigger a liberty interest. *See*, *e.g. Bryant v. Cortez*, 536

F.Supp.2d 1160, 1167 (C.D. Cal. 2008) (18-month segregation period did not trigger a liberty

interest)*.* Furthermore, there is no evidence here that the conditions did not mirror those of other

restrictive housing at SCCC, and plaintiff makes no allegation that her confinement adversely

affected the length of her sentence.

Plaintiff, however, asserts she experienced "atypical hardship" in segregation because of

issues unique to her transgender status, including harassment and a lack of privacy while

showering. Dkt. 56 at 19. It is not clear that whether these factors—which seem equally likely to

occur throughout the prison—are sufficiently "atypical" to create a liberty interest.

But even if a liberty interest were implicated here, plaintiff would have no claim unless

the deprivation was made without due process. In the limited circumstances where a liberty

interest in avoiding administrative segregation exists, "due process requires only the following

procedures:  prison officials must hold an informal non-adversary hearing within a reasonable

time after the prisoner is segregated. The prison officials must inform the prisoner of the charges

against the prisoner or their reasons for considering segregation. Prison officials must allow the

1  prisoner to present his views." *Toussaint*, 801 F.2d at 1100. "[D]ue process does not require

2  detailed written notice of charges, representation by counsel or counsel-substitute, an opportunity

3  to present witnesses, or a written decision describing the reasons for placing the prisoner in

4  administrative segregation." *Id.* at 1100–01.

5        Here, with respect to her disciplinary proceeding, plaintiff received a copy of the incident

6  report (Dkt. 92 at 140), had the opportunity to submit witness statements (Dkt. 92 at 141–144)

7  and attended her disciplinary hearing (Dkt. 79-1 at 26–28). With respect to her administrative

8  segregation placement specifically, plaintiff had an initial review on the day she was transferred

9  (Dkt. 79-1 at 33), an intermediate review on February 8, 2021 at which she submitted a written

10  statement (*Id.* at 33–34), a final review on February 19, 2021 (*Id.* at 35) and two extension

11  reviews on February 22, 2021 and April 2, 2021 (*Id.* at 36–37). Plaintiff also appealed her

12  placement in administrative segregation. Dkt. 92 at 101.

13        Plaintiff has received more than adequate due process regarding her confinement in

14  administrative segregation. The Court therefore recommends that plaintiff's segregation-related

15  due process claim  be dismissed.

16        3.    Denial of Grievances

17        Plaintiff also alleges due process claims arising out of the denial of her grievance for the

18  rejection of her cellmate request and her PREA complaint against defendant Downing for using

19  insulting language. Both claims fail because plaintiff has no due process right to a particular

20  grievance process.

21        Plaintiff cannot state a cognizable claim under § 1983 for the denial of grievances

22  because prisoners have no stand-alone due process rights related to the administrative grievance

23  process. *Ramirez*, 334 F.3d at 860; *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988); *Allen v.*

24  *Wood*, 970 F. Supp. 824, 832 (E.D. Wash. 1997); *Stewart v. Block*, 938 F. Supp. 582, 588 (C.D.

Cal. 1996). As there is no right to any particular grievance process, it is impossible for plaintiff's

due process rights to have been violated by any denial or failure to properly process her

grievances.

Furthermore, as discussed above, plaintiff has no substantive constitutional right to a

cellmate of her choice, or to be free from insulting language; there is therefore no corresponding

right to due process. *Tellis v. Godinez*, 5 F.3d 1314, 1316 (9th Cir. 1993) (due process guarantees

of the Fourteenth Amendment "apply only when a constitutionally protected liberty or property

interest is at stake.").

Plaintiff's Fourteenth Amendment claims arising out of the processing of her grievances

and PREA complaint fail to state a claim upon which relief can be granted; the Court therefore

recommends they be dismissed.

**G.    ADA/RA Claims**

The complaint alleges defendants violated the Americans with Disabilities Act ("ADA")

and the Rehabilitation Act ("RA") when they prolonged plaintiff's housing assignment in

segregation and did not place her in a women's prison. Dkt. 56 at 20, 30–32.

Title II of the ADA and § 504 of the RA both prohibit discrimination on the basis of

disability. The ADA applies only to public entities, whereas the RA proscribes discrimination in

all federally funded programs, but a substantially similar analysis applies to both.[15] To establish

a violation, plaintiff must demonstrate: (1) she is a qualified individual with a disability; (2) she

was excluded from participation in or otherwise discriminated against with regard to a public

entity's services, programs, or activities, and (3) such exclusion or discrimination was by reason

---

[15] Because "[t]here is no significant difference in analysis of the rights and obligations created by the ADA
and the Rehabilitation Act," resolution of the ADA claim necessarily resolves the RA claims as well. *See Zukle v.
Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999).

1   of her disability. *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002) (citing *Weinreich v.*

2   *Los Angeles Cty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997)). To recover damages,

3   plaintiff must prove intentional discrimination. *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir.

4   2008).

5          Plaintiff's complaint makes only a cursory, conclusory, allegation that DOC is unable "to

6   provide me reasonable accommodations . . . for my gender dysphoria." Dkt. 56 at 20. Plaintiff's

7   summary judgment motion contends plaintiff's disability is an inability to reproduce. Dkt. 75 at

8   22. Her motion asserts this disability is somehow not accommodated because DOC uses a "sex-

9   based classification system to determine her housing." *Id.* at 23.

10         Plaintiff's arguments—unsupported by evidence—fail to meet her burden to establish

11   defendants' decisions to house her in administrative segregation and not to transfer her to a

12   women's prison were caused by her gender dysphoria or inability to reproduce. Instead, the

13   record reflects plaintiff was moved to administrative segregation on January 21, 2021 after a

14   violent episode where she incurred serious infractions for threatening others with bodily harm,

15   refusing a staff order, manufacturing a weapon and refusing a housing assignment. Dkt. 79-1 at

16   30. Plaintiff's DOC records show she was retained there only until her infraction hearing was

17   completed and a Facility Plan was finalized for her housing, and she was released to her new

18   housing assignment on April 5, 2021. *Id.* at 31. There is simply no evidence that plaintiff was

19   kept in administrative segregation due to her transgender status or her inability to reproduce.

20         Plaintiff likewise submits no evidence demonstrating she was not transferred to a

21   women's facility "by reason of" her transgender identification or her inability to reproduce.

22   Plaintiff's bald statement that the decision was a result of a rigid "sex-based classification

23   system" (Dkt. 75 at 23) is belied by the record. Instead, the evidence demonstrates the

24

REPORT AND RECOMMENDATION - 34

committee charged with determining plaintiff's classification and housing assignment considered

transferring plaintiff to a women's facility, WCCW. Dkt. 79-1 at 32, 47. However, records of the

committee's meeting show plaintiff "state[d] she would like to stay at SCCC," and ultimately

that is what was recommended. Dkt. 79-1 at 44.

Plaintiff has failed to establish her ADA/RA claim; the Court therefore recommends that

it be dismissed with prejudice.

**H.    Breach of Duty**

Defendants construe plaintiff's complaint to assert a separate claim for breach of a duty

not to violate plaintiff's constitutional rights, and argue it fails as a matter of law because a tort

theory of negligence is inapplicable to § 1983 claims. Dkt. 78 at 11–12. Plaintiff did not respond

to defendants' argument.

It is not clear whether the complaint is, in fact, attempting to allege a breach of duty

claim. However, to the extent such a claim can be inferred from the complaint, it appears

plaintiff has abandoned it. In any event, defendants are correct that negligence theories do not

apply to claims brought under § 1983. *Daniels v. Williams*, 474 U.S. 327, 332–33 (1986).

**I.    Qualified Immunity**

Because the Court recommends dismissal on different grounds, it does not reach

defendants' argument that plaintiff's damages claims should be dismissed on qualified immunity

grounds.

**J.    John Doe Defendants**

Finally, plaintiff's Second Amended Complaint names two "John Doe" defendants who

have not been identified or served. Dkt. 56 at 5. On April 22, 2021, the Court warned plaintiff

that if these defendants were not identified and served, they would be subject to dismissal:

1    Plaintiff has also named "John Doe" and "Jane Doe" as defendants. Dkt. 53 at 5.
     Plaintiff is cautioned that the use of "John Doe" or "Jane Doe" to identify a
2    defendant is not favored. *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980).
     Although a plaintiff may be given an opportunity after filing a lawsuit to discover
3    the identity of unknown defendants through discovery, the use of Doe defendants
     is problematic because those persons cannot be served with process until they are
4    identified by their real names. If plaintiff does not provide the names of the
     defendants identified as Jane/John Doe so that they can be served within 90 days
5    of this order, they may be subject to dismissal. Fed. R. Civ. P. 4(m).

6    Dkt. 57 at 2–3. Plaintiff has not identified the Doe defendants and more than 90 days have

7    passed since her Second Amended Complaint was filed. The Court therefore recommends that

8    the "John Doe" defendants be dismissed without prejudice. Fed. R. Civ. P. 4(m).

9                                        **CONCLUSION**

10        For the above stated reasons, the Court recommends defendants' motion for summary

11   judgment (Dkt. 78) be granted and plaintiff's motion for summary judgment (Dkt. 75) be denied.

12   The Court recommends plaintiff's claims against the John Doe defendants be dismissed without

13   prejudice, her claims against all remaining defendants be dismissed with prejudice, and this case be

14   closed. The Court further recommends that to the extent plaintiff is bringing a claim pursuant to

15   RCW 72.09.135, supplemental jurisdiction be declined.

16        Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen

17   (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure

18   to file objections will result in a waiver of those objections for purposes of *de novo* review by the

19   district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit imposed by Fed. R.

20

21

22

23

24

Civ. P. 72(b), the clerk is directed to set the matter for consideration on May 13, 2022 as noted in the caption.

      Dated this 26th day of April, 2022.

David W. Christel
United States Magistrate Judge